## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

| | | |
|---|---|---|
| ROOSEVELT GLENN, SR. and | ) | |
| DARRYL KEITH PINKINS, SR., | ) | |
| | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| CITY OF HAMMOND; | ) | |
| Hammond Police Department | ) | |
| Lieutenant MICHAEL SOLAN, in his | ) | |
| individual capacity; Det. WENDY | ) | **JURY TRIAL DEMANDED** |
| MCBRIDE, in her individual capacity; | ) | |
| Officer MARK THARP, in his | ) | |
| individual capacity; RAYMOND | ) | |
| ROGALSKI, in his individual capacity; | ) | |
| WILLIAM STEPHENS, in his | ) | |
| individual capacity; KENNETH | ) | |
| STUMP, in his individual capacity; | ) | |
| PATRICIA KASPER, LEO FINNERTY, | ) | |
| in his individual capacity ; Indiana | ) | |
| State Police Lab Forensic Serologist | ) | |
| DIANA PETERSON, in her individual | ) | |
| capacity; and the Estate of Indiana | ) | |
| State Police Lab Forensic Serologist | ) | |
| KIMBERLY EPPERSON, in her | ) | |
| individual capacity. | ) | |

Defendants.

## <u>COMPLAINT</u>

The Plaintiffs, ROOSEVELT GLENN, SR. and DARRYL KEITH PINKINS, SR., by and through their attorneys, LOEVY & LOEVY, complain of Defendants CITY OF HAMMOND, MICHAEL SOLAN, MARK THARP, RAYMOND ROGALSKI, WILLIAM STEPHENS, KENNETH STUMP, PATRICIA KASPER, LEO FINNERTY, the Estate of KIMBERLY EPPERSON, and DIANA PETERSON, in their individual capacities, and allege as follows:

1

## INTRODUCTION

1.      Roosevelt Glenn and Darryl Pinkins lost decades of their lives wrongfully incarcerated for a 1989 rape that they did not commit.

2.      Mr. Glenn was wrongfully convicted in 1993 and was sentenced to 36 years in prison. A family man and father of two, Mr. Glenn spent 17 years behind bars before he was paroled. He was exonerated on January 30, 2017.

3.      Mr. Pinkins was wrongfully convicted in 1991 and was sentenced to 75 years in prison. Also a family man and father of four, Mr. Pinkins spent nearly 25 years in prison before his exoneration on April 25, 2016.

4.      In total, Mr. Glenn and Mr. Pinkins spent a combined four decades in prison despite not having any involvement in this crime. This manifest injustice was not an accident. Rather, it was the direct product of the Defendants conspiring to manipulate witnesses, fabricate evidence, and withhold exculpatory evidence.

5.      Sadly, Mr. Pinkins and Mr. Glenn were not the first men who Lieutenant Solan framed for crimes that they did not commit. Instead, this was his *modus operandi* while employed at the Hammond Police Department.

6.      Lieutenant Solan's misconduct, together with the misconduct of the other Defendants, resulted in Mr. Pinkins and Mr. Glenn being tragically torn from their families for the majority of their lives, and allowed for the real perpetrators of this horrific crime to evade justice for nearly 30 years.

7.      This lawsuit seeks to bring these injustices to light so that they never happen again.

## JURISDICTION AND VENUE

8.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

9.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

10.    Venue is proper under 28 U.S.C. § 1391(b) and (c). On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein all occurred within this district.

## THE PARTIES

11.    Plaintiff Roosevelt Glenn, Sr. is a 56-year old resident of Lake County, Indiana.

12.    Plaintiff Darryl Pinkins, Sr. is a 65-year old resident of Lake County, Indiana.

13.    In 1989, and at all times relevant to this Complaint, Mr. Glenn and Mr. Pinkins were residents of Gary, Indiana, residing in the Northern District of Indiana.

14.    In 1989, and at all times relevant to this Complaint, Defendants Mike Solan, Wendy McBride, Mark Tharp, Raymond Rogalski, Kenneth Stump, Patricia Kasper, and Leo Finnerty were Hammond City police officers, acting under color of law and within the scope of their employment. These defendants are each sued in their individual capacities.

3

15.     Collectively, Defendants Solan, McBride, Tharp, Rogalski, Stump, Kasper, and Finnerty are referred to herein as the "Hammond Defendant Officers".

16.     Collectively, Defendants Solan, McBride, Tharp, Rogalski, Stump, Kasper, Finnerty, and City of Hammond are referred to herein as the "Hammond Defendants".

17.     In 1989, and at all times relevant to this Complaint, Defendants Kimberly Epperson and Diana Peterson were forensic serologists with the Indiana State Police, were employed by the Indiana State Police, and were acting under the color of law and within the scope of their employment for the Indiana State Police. Defendants Epperson and Peterson are being sued in their individual capacities.

18.     Collectively, Defendants Epperson and Peterson are referred to herein as the "ISP Defendants".

19.     In 1989, and at all times relevant to the Complaint, Defendant the State of Indiana operated the Indiana State Police Crime Lab, a division of the Indiana State Police.

20.     Defendant City of Hammond is an Indiana municipal corporation located within this District that employs or employed the Defendant Officers at the time of the events giving rise to this Complaint.

## FACTUAL ALLEGATIONS

*The Crime*

21.     At approximately 1:30 am on December 7, 1989, M.W.,[1] a female resident of Lake County was waiting in her car at a red light near 165th Street and Parrish Avenue in Hammond, Indiana, when it was suddenly struck from behind by another vehicle.

22.     When M.W. exited her vehicle, presumably to check on the damage and speak to the driver of the other car, a group of men stole her purse and then forced her into another car. Thereafter, the five men spent the next several hours driving around with her in their vehicle.

23.     During this time, the men robbed M.W., stole her husband's gun and her jewelry, and repeatedly sexually assaulted her.

24.     According to M.W., all five men ejaculated, and as the collected evidence showed, at least some, if not all, of the men used M.W.'s own jacket to wipe off their semen.

25.     The men used a pair of coveralls to hide M.W.'s eyes during their assaults on her.[2] She was still clutching the coveralls when the men released her several hours later.

---

[1] Out of respect for the victim, only her initials will be used throughout the Complaint.
[2] During her initial interview at the hospital, M.W. told the Defendant officers that the assailants threw a "green welder's-type coat over [her] head."

*The Victim's Description of the Assailants*

26.     During the Defendant Officers' initial interviews of M.W., she described all five of her assailants as being black and in their "mid 20s." At a January 1991 deposition, M.W. specifically stated that the man who approached her car (and the fourth to assault her) was a black male in his mid-twenties.

27.     M.W. stated that the assailants' voices sounded young and that they used "punk talk."

28.     According to M.W., all five males were wearing "green army fatigue-type clothing" and dark knit hats. From what she could tell, four of the men had medium complexion while one was darker.

29.     She described the assailants' vehicle as being a large 4-door light green mid-1970s Buick or Oldsmobile.

30.     The last two subjects to assault M.W. were "much more violent and rough with her." According to M.W., one of the assailants repeatedly stated that he was "not going to go back to prison for her."

*The Robbery of M.W. Occurs During a Spate of Local*
*Vehicular Assaults and Robberies*

31.     Around 1:00 a.m., approximately thirty minutes before these men rear-ended M.W., flight attendant Jill Martin was on her way home on Interstate 65 near Merrillville, Indiana, when her car was bumped from behind by another vehicle. According to Ms. Martin, this car followed her beginning on Interstate 94 during her drive home from working at a Chicagoland airport. Importantly, Ms.

Martin – and the men who followed her – drove southbound on I-94 before turning onto I-65.

32.    After being hit, Ms. Martin pulled over but remained in her car with her doors locked. The car which bumped her pulled in front of her vehicle.

33.    Thereafter, the black male driver got out of the vehicle, approached her vehicle, and asked Ms. Martin if she was okay. When another truck approached the scene, the driver of the car and two other black males, who also came from the same car, quickly got back into the vehicle and drove away.

34.    Before the males pulled off, however, Martin was able to get a look at their car and noted a partial license plate number. She provided that plate number to the Hammond Defendant Officers.

35.    Additionally, one week prior to the attack on M.W., Hammond Police took a report from a separate female where she indicated that three black males in a possible Buick ran into her car, followed her home, and then stole her purse. That female was able to give the Hammond Defendant Officers a potential license plate number as well.

36.    Neither of these license plate numbers have ever been connected to Plaintiffs or to any of their co-defendants.

*The Plaintiffs' Activities the Night M.W. Was Assaulted*

37.    At the time of the attack on M.W., Darryl Pinkins was a 38-year-old married father of young children who worked as a burner at Luria Brothers, a scrap metal operation which was located within Bethlehem Steel Mill.

38.     At the time of the attack on M.W., Roosevelt Glenn was a 27-year-old father of young children who worked as a payloader at Luria Brothers.

39.     Neither man had a criminal history.

40.     On the night just prior to M.W.'s assault, Mr. Glenn and Mr. Pinkins worked at Luria Brothers until approximately 11:00 p.m., at which point they left work with co-worker William Durden in Mr. Durden's car. Significantly, Mr. Durden's car was a red Ford Escort. All three men carried with them their work clothing, including fire-retardant coveralls that were standard issue by the Mill for the majority of Mill workers.

41.     Shortly after leaving the Mill, Mr. Durden's car stopped running and as such the men left the vehicle on the side of the road. They then walked to a pay phone where Mr. Glenn called his girlfriend to let her know they were stranded without a car and to ask her to pick them up. It took approximately 45-minutes for Mr. Glenn's girlfriend to arrive.

42.     During the underlying investigation, the Hammond Defendant Officers were aware of significant corroborating evidence confirming Plaintiffs' account that their vehicle was disabled.

43.     For instance, Horace Wright, an Indiana State Police Trooper, observed Mr. Durden's disabled vehicle on the side of the interstate and claimed to have offered the men a ride. The trooper did not indicate seeing the men carrying anything.  Mr. Wright personally conveyed this information to Defendant Solan during the underlying investigation.

44.     After Mr. Glenn's girlfriend picked the men up, they took her home and then borrowed her car to drive to the liquor store in order to cash their paychecks. The car they borrowed was a light blue, two-door Pontiac with a white top.

45.     The paychecks were cashed at a Gary liquor store around 12:30 a.m. on December 7.

46.     Significantly, as the Hammond Defendant Officers were well aware, Plaintiffs were never in a green car during the evening just prior to and on the day that M.W. was attacked.

47.     Thereafter, the men drove to a gas station in Gary where they purchased quarts of oil for Mr. Durden's car before driving back to where they had left the disabled vehicle.

48.     When they arrived at Mr. Durden's car, the men discovered that the passenger side window of the car had been shattered and someone had stolen a duffel bag and two shopping bags containing their work clothes, including their coveralls.

49.     Based on this timeline of events, the Hammond Defendant Officers were aware that Plaintiffs and Mr. Durden could not have crashed into Ms. Martin – who was being followed from the Chicagoland area at the same time Plaintiffs were cashing their checks in Gary, Indiana – nor could they have attacked M.W., as they were in a completely different city by that time attempting to fix Mr. Durden's vehicle.

50.    When Mr. Glenn, Mr. Pinkins, and Mr. Durden returned to work on Monday, December 9, 1989, they reported that their coveralls had been stolen from Mr. Durden's disabled car and they were issued new coveralls.

*The Defendants Arrest Mr. Pinkins and Mr. Glenn Without Probable Cause*

51.    The attack on M.W. was investigated by Defendant Lieutenant Solan. Early on in his investigation, Lieutenant Solan determined that the pair of coveralls left with M.W. came from Luria Brothers, a large operation that employed more than a hundred workers.

52.    Despite having no specific evidence linking those coveralls to Mr. Durden, Mr. Pinkins, or Mr. Glenn, and despite the fact that all three men did not match the description of the assailants provided by M.W., and despite the timeline excluding them from the incidents described above, Lieutenant Solan decided to frame them for a crime that they did not commit.

53.    The Defendant Officers subsequently also investigated Barry Jackson and Gary Daniels, who also worked at Luria Brothers. Mr. Daniels drove a full-sized Pontiac but the license plate did not match that provided by Ms. Martin. Mr. Jackson simply worked and was friends with the other suspects.

54.    All five men were arrested by Defendant Solan at Luria Brothers on January 2, 1990.

55.    All five men voluntarily gave blood, saliva, head and pubic hair samples to hospital personnel on the date of their arrest.

56.     After his arrest, the police processed Mr. Daniels' car for fingerprints and found no evidence linking the car to any crime.

57.     In the seven months after the Defendant Officers arrested the five men (and while all were in custody), there were 18 more incidents in the Northwest Indiana area in which a driver was robbed after their vehicle was deliberately bumped by another, and one additional incident in which a female driver was attacked and raped after her car was deliberately bumped by another. None of those incidents were ever linked to Plaintiffs in any way.

*The Defendants Fabricate and Misrepresent Physical Evidence*

58.     In December of 1989, Kimberly Epperson, a forensic serologist and DNA analyst with the Indiana State Police (ISP) Lab, received a sexual assault evidence collection kit ("rape kit") and a sweater belonging to M.W. for analysis. The rape kit included a blood standard from M.W.

59.     Blood standards from the five targets of Defendant Solan were later obtained by Defendant Epperson as well.

60.     Epperson found several hairs on the sweater. She also observed two stains of seminal fluid on the sleeve of the M.W.'s sweater.

61.     In August of 1990, eight months after their arrests, DNA testing **excluded** each of the five men as contributors of the bodily fluid collected in the rape kit and found on M.W.'s sweater. Despite having this undeniable exculpatory evidence, the Defendants continued with the investigation and prosecution of Mr. Glenn and Mr. Pinkins.

11

*The Hair*

62.     In early 1990, ISP serologist and the State's hair comparison expert at trial, Defendant Diana Peterson, microscopically examined a hair collected from M.W.'s sweater.

63.     In a February 1990 written report concerning the forensic analysis of the hair, Defendant Peterson falsely reported that a hair recovered from M.W.'s sweater was "sufficiently similar to the head hair standards from R.T. Glenn to be of common origin."

64.     On April 30, 2007, Orchid Cellmark, one of the world's largest private DNA testing facilities, issued a written report noting that microscopic and mitochondrial DNA testing (mtDNA) definitively proved that the hair could not have come from Mr. Glenn.

65.     Defendant Peterson's February 1990 written report asserting that the hair recovered from M.W.'s sweater was "sufficiently similar…to be of common origin" and/or matched a hair from Mr. Glenn, was an outright fabrication. Defendant Peterson knew that the hair from Mr. Glenn did not exhibit all of the microscopic characteristics observed on the crime scene hair. In fact, Defendant Peterson knew that the comparison revealed differences that excluded Mr. Glenn from contributing the hair found at the scene. Nevertheless, on information and belief, Defendant Peterson falsely reported to the Hammond Defendant Officers that the hairs were a match.

66.     Based on her false and fabricated report, Defendant Peterson later testified that the hair found on M.W.'s sweater matched the hair sample taken from Mr. Glenn, and even went so far as to note that Mr. Glenn's hair had unique characteristics that she falsely claimed were significant in her conclusion that the two hairs matched. Defendant Peterson further stated that the forensic sample matched "each and every one of the twenty-six characteristics" of the hair sample taken from Mr. Glenn, and that Mr. Glenn's hair "would have to match exactly or [she] wouldn't call it a match."

67.     Defendant Peterson also stated that there were no other hairs that did not belong to M.W. that were sufficient for comparison. This too was a fabrication on her part.

68.     In closing arguments, the State repeatedly relied on the results of Defendant Peterson's false and fabricated report, as well on her false testimony, in seeking a guilty verdict against Mr. Glenn.

*Defendants Disregarded DNA Evidence Exculpating the Plaintiffs*

69.     Cellmark Diagnostics received the above-stated physical evidence for testing in early 1990. DNA was extracted from that evidence and was tested by Cellmark.

70.     Thereafter, in an August 1990 report addressed to Defendant Epperson that was authored by a staff molecular biologist at Cellmark Diagnostics, the biologist reported that the DNA banding pattern obtained from the seminal stains on the jacket and the sweater contained the DNA banding patterns from at

least three (3) individuals. One of those patterns matched the DNA banding pattern from the blood stain from M.W. More important, the report indicated that the remaining two (2) DNA banding patterns did not originate from nor match that of Mr. Glenn, Mr. Pinkins, or of any of the three other suspects.

71.     In other words, the DNA found in the seminal fluid belonged to two (2) individuals who were not the Plaintiffs and also did not belong to any of the other three men targeted by the Defendant Officers. Additional male DNA in the mixture was missing unique DNA markers from any of the five men, and none of the DNA found on the sweater, jacket, or in sexual assault kit belonged to Mr. Pinkins or to Mr. Glenn.

72.     Although Defendant Solan notified the victim on September 11, 1990 that there were two identified sources of DNA that did not match Mr. Glenn, Mr. Pinkins, or any of the other three men, he and the other Defendants continued in their quest to frame Mr. Glenn and Mr. Pinkins for the rape, and in doing so, intentionally ignored the exculpatory evidence described above.

73.     Further, the Defendants did not follow up nor investigate the source of the two identified DNA profiles. They did not run a Combined DNA Index Search ("CODIS") search on the profiles. Instead, they continued with the prosecution and wrongful conviction of Mr. Glenn and Mr. Pinkins.

*The Semen*

74.     Defendant ISP Serologist Kimberly Epperson conducted ABO blood typing and enzyme typing on the seminal fluid found on the vaginal/cervical swab

from M.W.'s rape kit, as well as on the seminal fluid found in four locations on M.W.'s jacket, and in two locations on M.W.'s sweater. Such testing is conducted to determine the blood and enzyme types of the person(s) who left the seminal stains.

75.     Defendant Epperson also obtained and tested blood and saliva samples from all five men, including Mr. Pinkins and Mr. Glenn.

76.     Thereafter, in February 1990, Defendant Epperson issued a written report stating that Mr. Glenn, Mr. Pinkins, and Mr. Durden could not be excluded as contributors to the seminal fluid samples that she analyzed. Defendant Epperson issued this report despite knowing that the conclusions therein were fabricated and false.

77.     At trial, Defendant Epperson falsely testified to the same despite the fact that DNA testing had proven that neither the Plaintiffs nor Mr. Durden were the contributors of any of the seminal stains. Indeed, rather than testify that DNA evidence excluded the three men as the contributors of the seminal fluid tested (or that the serology inclusion she initially obtained was meaningless in the face of a DNA exclusion), Defendant Epperson instead falsely testified that serology testing is more sensitive than DNA testing. The prosecutor relied on her fabricated report and on this false testimony in seeking guilty verdicts against Mr. Pinkins and Mr. Glenn.

*The Defendants Manipulated a False Identification from M.W.*

78.     M.W. consistently maintained in interviews with Defendant Solan that she could not identify any of the men who attacked her. When attempting to

describe the first man who approached her car (and the fourth man to assault her), she stated she had only seen the man's face for approximately five seconds.[3]

79.    Defendant Solan initially asked M.W. to view a physical lineup or photographic array of the suspects in the case but M.W. refused because she did not believe she could identify anyone.

80.    However, in January of 1990, Defendant Solan took individual mugshots of the five men he had arrested to M.W.'s home to show her, setting them on the dining room table where M.W. and her husband were seated. When M.W. viewed these photographs, she made no identification.

81.    Upon information and belief, during this January 1990 meeting, Defendant Solan encouraged M.W. to make an identification, and by placing these specific photographs in front of her, provided her with information that influenced her subsequent identifications. Indeed, Defendant Solan would not accept M.W.'s reluctance to make an identification, and, upon information and belief, Defendant Solan ultimately pressured and manipulated M.W. into identifying Mr. Pinkins as one of her attackers. This exculpatory information was withheld from Mr. Pinkins and from Mr. Glenn.

82.    Thereafter, at a May 1990 court proceeding, M.W. informed Defendant Solan and the prosecutor for the first time that Mr. Pinkins was the assailant who originally walked up to her vehicle before she was attacked. Defendant Solan produced a written report about this identification, omitting the fact that he had

_____

[3] It should also be noted that Defendant Solan and the other Hammond Defendant Officers knew that M.W.'s blood alcohol content at the time of the attack was anywhere from .15-.20, thus severely impacting M.W.'s ability to make a reliable identification.

talked with M.W. in the hallway prior to her identification of Mr. Pinkins, as well as the fact that he had visited with her in January and provided her with a picture of Mr. Pinkins (as well as of Mr. Glenn and the other 3 targets of the Defendant Officers), and had otherwise encouraged and influenced her to make an identification.

83.     Later, before her January 1991 deposition, during a conversation about Mr. Pinkins, Defendant Solan showed M.W. a single eight-and-a-half by fourteen-inch photograph of Mr. Pinkins.

84.     Defendant Solan engaged in these extremely and unduly suggestive photo-array procedures to procure a false identification from M.W. In the process, Defendant Solan withheld the exculpatory evidence which caused M.W.'s false identification of Mr. Pinkins at their criminal trials. The false identification procured by Defendant Solan was presented to the respective juries and helped cause Plaintiffs' wrongful convictions.

*The Defendants Fabricate the Testimony of Jailhouse Snitches*

85.     The Hammond Defendant Officers continued their conspiracy to frame Mr. Glenn and Mr. Pinkins by manufacturing fabricated and false statements for jailhouse snitches that were introduced at Plaintiffs' criminal trials and helped contribute to their wrongful convictions.

86.     For example, Defendant Solan and the other Hammond Defendant Officers procured a false statement from George Hennington, an inmate awaiting trial who had been housed at the Lake County Jail with Mr. Glenn.

17

87.     In order to solicit false information from a jailhouse snitch, Defendant Solan actively searched for informants at the Lake County Jail, bringing men down from their cells in groups of five or more to meet with him so that he could determine which of them he could most easily manipulate into falsely implicating the Plaintiffs.

88.     Defendant Solan first approached Hennington in April of 1990 when Hennington was awaiting a jury trial for armed robbery and two counts of dealing cocaine. Defendant Solan then fabricated a statement for Hennington that indicated that Mr. Glenn had a vague discussion with him about the crime while they were both detained at the Lake County Jail. The statement ultimately obtained from Hennington was false and fabricated by Defendant Solan.

89.     Defendant Solan promised Hennington leniency if he adopted the falsified statement. It was never disclosed to Mr. Glenn, his attorneys, or to the prosecutor, that Hennington was promised consideration in exchange for agreeing to provide a fabricated statement.

90.     Defendant Solan spoke to Hennington again on November 22, 1991, after Hennington had been convicted of auto theft. At that time, Defendant Solan fabricated another false statement that he had Hennington sign that stated, for the first time, that Mr. Glenn had described participating in the rape of M.W.

91.     Hennington later testified at trial against Mr. Glenn in exchange for a letter written from the prosecutor to the parole board on his behalf. This false

testimony was based on a handwritten statement about the rape provided to him by Defendant Solan and it contributed directly to Mr. Glenn's wrongful conviction.

92. Defendant Solan used a second informant – Reggie West – to falsely implicate Mr. Pinkins in the rape of M.W. West first spoke with Defendant Solan in April of 1990.

93. Upon information and belief, Defendant Solan made similar promises to West as he made to Hennington. As a result, in October of 1990, West gave a false and fabricated written statement that claimed that Mr. Pinkins was standing outside a liquor store when two of his co-workers pulled up with a white woman in the backseat of the car. He further said that Mr. Pinkins had told him that he did not ejaculate, statements that conflict with M.W.'s account of the event.

94. The information forming the basis of this false and fabricated statement came from Defendant Solan, a fact that Defendant Solan withheld from the Plaintiffs.

95. West later testified to the substance of the false statement that Defendant Solan manufactured for him. This, too, contributed to Plaintiffs' wrongful convictions.

*The Defendants Withheld Exculpatory Evidence*
*about the Proceeds from the Crime*

96. In 1997, the Hammond Police Department recovered the gun stolen from M.W. during the crime in question.

19

97.     In 2002, Defendant Solan interviewed the juvenile, I. Jones, from whom M.W.'s gun was recovered. During that interview, Jones stated that he had obtained the gun from someone called "Cheese."

98.     Defendant Solan knew that "Cheese" was not Mr. Pinkins or Mr. Glenn, and that "Cheese" had no known connection to either man.

99.     This gun was therefore recovered in a manner indicative of Mr. Glenn's and Mr. Pinkins' innocence. At the very least, the recovery of the gun and the information provided by Jones required further investigation. Yet, despite knowing that this evidence was exculpatory, not only did Defendant Solan not disclose this information to the prosecutor or the defense, but, incredibly, Defendant Solan maintained possession of this weapon at his own home and did not relinquish custody of the evidence to the Hammond Police Department, as the law required him to do.

100.    Defendant Solan has kept this gun at his home until the present, and has never produced it to either Plaintiffs or to the Hammond Police Department. In short, Defendant Solan affirmatively hid, and continues to hide, evidence that would have helped prove the innocence of Mr. Glenn and Mr. Pinkins.

## THE DEFENDANTS' WRONGFUL PROSECUTION AND CONVICTION OF GLENN AND PINKINS

101.    As a result of the Defendant Officers' misconduct, Mr. Glenn and Mr. Pinkins were arrested. The Hammond Defendants initiated charges against Mr. Glenn and Mr. Pinkins for rape, criminal deviate conduct, and robbery.

102.    There was no probable cause to believe that Plaintiffs were involved in the crime.

103.    Nonetheless, the Defendants used the fruits of their misconduct to cause Plaintiffs to be prosecuted.

104.    As a result of the Defendants' manipulation of witnesses, flawed and false forensic reports, and the withholding of exculpatory evidence that would have demonstrated their innocence, the Plaintiffs were convicted and sentenced to decades of imprisonment.

## PLAINTIFFS' EXONERATIONS

105.    Since their initial arrest, Mr. Glenn and Mr. Pinkins have maintained their innocence of the charges against them and have fought for their freedom.

106.    In 2003, Mr. Glenn filed a post-conviction petition asking the Court for permission to test hair samples and physical evidence that had been presented at trial.

107.    The Court granted that request and directed the State to release the physical evidence in the case for DNA testing. Subsequently, the State turned over the evidence, including two hairs, to Mr. Glenn for testing. One hair was the hair that Defendant Peterson reported matched Mr. Glenn; the other was a hair taken from the pubic hair combing of M.W. that had never been tested before, even though it had a root.

108.    The results of that testing established that the hair Defendant Peterson identified as Mr. Glenn's was, in fact, **not** his hair.

21

109.    Subsequent TrueAllelle[4] testing was done on the DNA mixtures found in the seminal fluid on M.W.'s clothing. Along with the original two (2) DNA profiles established before trial, TrueAllele was able to identify two (2) additional DNA profiles. Neither of those new profiles matched Mr. Glenn or Mr. Pinkins or the three other men the Defendants arrested and accused of the crime.

110.    The testing also revealed that the hair with the root did not match any of the suspects or the four established profiles in the semen either.

111.    The TrueAllele testing further established that three of the profiles, which did not match Mr. Glenn, Mr. Pinkins, or the three other suspects, are related; three of the profiles belong to brothers. None of the five individuals the Defendants arrested in this case are related.

112.    After the new DNA testing further confirmed that Mr. Glenn and Mr. Pinkins were in fact innocent of the crime, post-conviction counsel moved for a new trial.

113.    Because of this, on April 25, 2016, the Lake County Superior Court granted the post-conviction motion and dismissed the charges against Mr. Pinkins.

114.    On January 30, 2017, the Lake County Superior Court granted the post-conviction motion and dismissed the charges against Mr. Glenn.

---

[4] TrueAllelle testing is a computer program specifically designed to analyze DNA mixtures. It allows technicians to see profiles belonging to minor contributors to DNA mixtures in a way that lab technicians cannot do otherwise.

### *The Hammond Defendants' Pattern and Practice of Misconduct to Secure Wrongful Prosecutions and Convictions*

115.    The investigative misconduct that led to Mr. Glenn and Mr. Pinkins' arrest, indictment, malicious prosecution, wrongful conviction and imprisonment was not an anomaly. Rather, it was simply the way the Hammond police closed cases.

116.    Specifically, before, during, and since the unlawful investigation, prosecution, and conviction of Mr. Glenn and Mr. Pinkins, the City of Hammond and the Hammond Police Department, by and through its final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by Hammond police investigators, including but not limited to the following:

      a.    fabricating evidence;

      b.    failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

      c.    destroying evidence;

      d.    failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

      e.    disregarding the Fifth and Fourteenth Amendment rights of criminal suspects and defendants; and

      f.    engaging in the ongoing affirmative concealment and cover-up of police misconduct.

117.    Before, during and after the unlawful investigation, prosecution, and conviction of Mr. Pinkins and Mr. Glenn, the Hammond Defendants, by and

through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of failing to adequately train, supervise, and discipline Hammond Defendant Officers regarding fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to the following:

      a.    conducting witness identification procedures, including photo arrays and live lineups;

      b.    maintaining physical evidence and accurately documenting investigative work;

      c.    documenting and promptly disclosing exculpatory and impeachment evidence to prosecutors;

      d.    conducting constitutionally adequate investigations with objectivity rather than tunnel vision; and

      e.    conducting custodial interrogations and witness interviews.

118.   Pursuant to these unconstitutional policies, customs, or patterns and practices, the Hammond Defendants' final policymakers abdicated and effectively delegated to detectives, including but not limited to defendants Solan, McBride, Tharp, Rogalski, Stephens, Stump, Kasper, and Finnerty, the authority and discretion to conduct and supervise investigations with deliberate and reckless disregard for their constitutional duties and the rights of innocent suspects.

119.   As a result, detectives, officers, and supervisors, including but not limited to defendants Solan, McBride, Tharp, Rogalski, Stephens, Stump, Kasper, and Finnerty, routinely and knowingly engaged in investigative misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

120.    The unconstitutional municipal policies, customs, and practices of investigative misconduct and failure to supervise, train and discipline police were reflected in the multiple acts of misconduct and illegality committed by multiple Hammond Defendant Officers, detectives and supervisors in relation to multiple suspects and witnesses in the underlying investigation, as described above.

### The Hammond Defendants' Custom and Practice of Fabricating Inculpatory Evidence and Failure to Supervise and Discipline Police Regarding their Obligations not to Fabricate or Withhold Exculpatory Evidence

121.    By 1989, it was a well-established legal principle and a fundamental tenet of responsible police practices that fabricating evidence against a suspect violates the suspect's constitutional rights. It was likewise well-established by 1989 that withholding exculpatory evidence from a suspect is a violation of their constitutional rights. Nonetheless, the Hammond Defendants, by and through their final policymakers and delegees, failed either to supervise their police to ensure they did not fabricate nor withhold exculpatory evidence, or to discipline police when they did. These municipal failures created an environment of impunity in which fabricating evidence was tacitly, and sometimes explicitly, authorized.

122.    These systemic municipal lapses and unconstitutional fabrications of evidence were the norm by 1989. For example, in 1980, Hammond officers Solan and Myszak, fabricated a positive identification during the underlying investigation instead of revealing – as Defendant Solan did decades later – that the witness only tentatively made an identification of the suspect. The officers thereby fabricated this evidence to create probable cause to prosecute Mayes.

123.    Between 1990 and 1992, in accordance with these unconstitutional customs and practices, Hammond police officers wrongly arrested, deliberately manufactured a case against, destroyed and ignored exculpatory evidence, maliciously prosecuted and covered up or withheld exculpatory and impeachment evidence from another innocent suspect, Larry Mayes, who was wrongfully convicted of a crime. For example, in the investigation which led to Mr. Mayes' wrongful conviction, the defendants withheld that the victim in the investigation was put under hypnosis. Additionally, during that investigation the officers conducted an unduly suggestive photo-array that included multiple photographs of Larry Mayes, the Hammond officers suspect at the time. In short, Mayes experienced many of the same types of misconduct that led to Mr. Pinkins and Mr. Glenn's wrongful convictions.

124.    Here, as is described above, in accordance with the Hammond Defendants' unconstitutional policy or practice of manufacturing false evidence and failing to train, supervise, and discipline officers fabricated the evidence that led to Mr. Pinkins and Mr. Glenn's indictments and convictions.

### The Hammond Defendants' Custom and Practice of Suppressing Brady Evidence and Failure to Train, Supervise and Discipline Officer Regarding Brady Obligations

125.    In 1999, police had a clearly established constitutional duty to disclose exculpatory and impeachment information to prosecutors under *Brady v. Maryland*, *Giglio v. United States*, and their progeny. Failing to carry out these *Brady* disclosure duties posed obvious risks for criminal defendants, yet the Hammond

Defendants utterly failed to supervise or train police in this regard. Specifically, the Hammond Defendants did nothing to ensure police understood their *Brady* duties and carried them out in practice.

126.    The Hammond Defendants took no action to properly train officers in how to meet their *Brady* obligations.

127.    As a direct result of the Hammond Defendants' deliberate indifference to the obvious risk this endemic *Brady* confusion posed to criminal defendants—and specifically to innocent suspects like Mr. Pinkins and Mr. Glenn—the confusion persisted throughout the underlying investigation and indeed for years thereafter without intervention from supervisors or policymakers.

128.    For example, as noted above, pursuant to this custom and practice, Hammond officers in 1980 arrested, maliciously prosecuted and covered up or withheld exculpatory and impeachment information—including evidence of their own misconduct—from Larry Mayes. As a result, Mayes was wrongly convicted of a rape he did not commit and endured more than nineteen of imprisonment before he was proven innocent and released.

129.    Mayes sued. In that suit, Mr. Mayes alleged that the defendants – including Solan and the City of Hammond – violated his constitutional right to a fair trial and due process of law by fabricating evidence, coercing witnesses, conducting photo-arrays that were improper and unduly suggestive, and by withholding exculpatory evidence.

27

130.    Mr. Mayes alleged that the Defendants engaged in such misconduct pursuant to the policies, practices and customs wrongfully maintained by the Defendant City of Hammond.

131.    Mr. Mayes was ultimately afforded a trial on his claims against Defendants City of Hammond and Michael Solan. In 2006, a jury found in favor of Mr. Mayes and against Defendants Solan and the City of Hammond. On Mr. Mayes' policy and practice claim against Defendant City of Hammond, the jury once again found in favor of Mr. Mayes. As a result, Mr. Mayes was awarded with a $9,000,000 verdict.

132.    Here, the very same municipal customs, practices and systemic lapses in training, as well as systemic lapses in supervision and discipline, led police to arrest, maliciously prosecute, and cover up and withhold exculpatory and impeachment information from Mr. Pinkins and Mr. Glenn.

### *The Hammond Defendants' Final Policymakers and Delegees Were on Notice of the Systemic Unconstitutional Customs, Practices and Lapses in Training, Supervision and Discipline*

133.    The Hammond Defendants' unconstitutional policies, customs, or patterns and practices of investigative misconduct and failure to supervise and train detectives and officers were reflected in numerous prior cases and investigations of which the Hammond Defendants and their final policymakers were on notice before the underlying investigation.

134.    For example, Hammond Defendants knew and were on actual notice that Defendant Solan had, in other prior felony investigations, destroyed evidence

that had substantial power to prove suspects' innocence. Yet, the Hammond Defendants never conducted a meaningful internal investigation into his misconduct, never disciplined him, and did not ensure that he was more closely supervised despite the obvious risk he posed, leaving him free to act with impunity.

135.   Before the wrongful convictions of Mr. Pinkins and Mr. Glenn, the City of Hammond's final policymakers were on actual and/or constructive notice of these unconstitutional customs and resulting misconduct of Defendants Solan and the other Hammond Defendant Officers.

136.   Despite their notice of ongoing lapses of constitutional magnitude, the Hammond Defendants' supervisors and final policymakers, acting with deliberate indifference, failed to train, supervise, discipline, or otherwise remediate Hammond police officers.

### *Plaintiffs' Damages*

137.   Mr. Glenn spent 16 years, eight months, five days, and approximately 12 hours incarcerated for a crime he did not commit. Upon his release, Mr. Glenn was subjected to parole and then required to register as a sex-offender until he was exonerated in 2017.

138.   Tragically, Mr. Pinkins spent more than 24 years incarcerated for a crime he did not commit.

139.   Together, having missed a combined four decades of their lives, Mr. Pinkins and Mr. Glenn must now attempt to rebuild their lives.

140.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Glenn and Mr. Pinkins sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom, physical pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which they are entitled to monetary relief.

141.    Additionally, the emotional pain and suffering caused by losing those years has been substantial. During their incarceration, Mr. Glenn and Mr. Pinkins were stripped of various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. Mr. Glenn and Mr. Pinkins missed out on the ability to share holidays, births, funerals, and other life events with loved ones, and the fundamental freedom to live one's life as autonomous human beings.

142.    Because of the foregoing, Mr. Glenn and Mr. Pinkins have suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

## Count I - 42 U.S.C. § 1983
## Due Process

143.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

144.   As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Mr. Glenn and Mr. Pinkins of their constitutional right to a fair trial.

145.   In the manner described more fully above, the Defendants conducted a reckless investigation, deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Mr. Glenn and Mr. Pinkins could not and would not have been pursued.

146.   The Defendants' misconduct also directly resulted in the unjust criminal conviction of Mr. Glenn and Mr. Pinkins, thereby denying each of his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

147.   As a result of this violation of his constitutional right to a fair trial, Mr. Glenn and Mr. Pinkins suffered injuries including but not limited to emotional distress and pain and suffering, as is more fully alleged above.

148.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Glenn and Mr. Pinkins' constitutional rights.

149.    The misconduct described in this Count was undertaken pursuant to routine practice of the Hammond Police Department to pursue wrongful convictions through reckless and profoundly flawed investigations, provision of false evidence and reports, coerced evidence, and failure to properly supervise employees knowing that those employees were providing false evidence. In this way, the Hammond Defendants violated Mr. Glenn and Mr. Pinkins' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

150.    These widespread practices, so well-settled as to constitute *de facto* policy in the Hammond Police Department, were able to exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to these problems, thereby effectively ratifying them.

151.    The widespread practices described in the preceding paragraphs were allowed to flourish because the City of Hammond declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count II – 42 U.S.C. § 1983
## Malicious Prosecution

152.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

153.    As described more fully above, the Defendants, individually, jointly and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Mr. Glenn and Mr. Pinkins of their constitutional right to be free from unlawful prosecution and continued detention without probable cause.

154.   In the manner described more fully above, the Defendants made, influenced and/or participated in the decision to prosecute Mr. Glenn and Mr. Pinkins for these crimes, for which prosecution there was no probable cause and which caused Mr. Glenn and Mr. Pinkins to suffer a deprivation of liberty. Their misconduct included falsifying evidence, fabricating evidence, and withholding exculpatory evidence.

155.   The Defendants' misconduct directly resulted in the unlawful prosecution and incarceration of Mr. Glenn and Mr. Pinkins, thereby denying each of his constitutional right to liberty in violation of his constitutional rights.

156.   As described more fully above, the prosecution was ultimately resolved in Mr. Glenn and Mr. Pinkins' favor with the Lake County Superior Court granted them a new trial and dismissed their charges. In sum, Plaintiffs' prosecution was resolved in a manner indicative of their innocence.

157.   Because of this violation of their constitutional rights, Mr. Glenn and Mr. Pinkins suffered injuries, including but not limited to bodily harm and emotional distress, as is more fully alleged above.

158.   The Defendants' misconduct, as described in this Count, was objectively unreasonable and was undertaken intentionally with malice and willful indifference to Mr. Glenn and Mr. Pinkins' constitutional rights.

159.   The misconduct described in this Count was undertaken pursuant to a routine practice of the Hammond Police Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed

investigations and coerced evidence. In this way, the City of Hammond violated Mr. Glenn and Mr. Pinkins' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

160.   These widespread practices, so well-settled so as to constitute *de facto* policy in the Hammond Police Department, could exist and thrive because municipal policymakers with authority over the Division of Police exhibited deliberate indifference to the problem, thereby effectively ratifying it.

161.   The widespread practices described in the preceding paragraphs could flourish because the City of Hammond declined to implement sufficient training and/or enforce legitimate oversight and punishment.

## Count III – 42 U.S.C. § 1983
## Fourth and Fourteenth Amendments Fabrication of False Evidence

162.   Each paragraph of this Complaint is incorporated as if restated fully herein.

163.   In the manner described more fully above, the Defendants, individually, jointly and in conspiracy with each other, fabricated evidence, including without limitation, false police reports, false forensic reports, and fabricated testimony offered at trial proceedings. The Defendants knowingly fabricated this evidence. A reasonable likelihood exists that the false evidence affected the decision of the jurors and the courts that considered this false evidence.

164.   Defendants were acting under color of law and within their scope of employment when they took these actions.

165.   The Defendants' misconduct directly resulted in the unjust continued

34

incarceration of Mr. Glenn and Mr. Pinkins, thereby denying each of his constitutional right to due process as guaranteed by the U.S. Constitution. Absent this misconduct, there would have been no probable cause for Mr. Glenn and Mr. Pinkins' continued detention, and the prosecution of the Plaintiffs could not and would not have been pursued.

166.   The misconduct described in this Count was undertaken pursuant to a routine practice of the Hammond Police Department to pursue wrongful prosecutions and wrongful convictions through reckless and profoundly flawed investigations and coerced evidence. In this way, the Hammond Defendants violated Mr. Glenn and Mr. Pinkins' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

167.   These widespread practices, so well-settled so as to constitute *de facto* policy in the Hammond Police Department, could exist and thrive because municipal policymakers with authority over the Police Department exhibited deliberate indifference to the problem, thereby effectively ratifying it.

168.   The widespread practices described in the preceding paragraphs could flourish because the Hammond Defendants declined to implement sufficient training and/or enforce legitimate oversight and punishment.

169.   As a direct and proximate result of the Defendant' actions, Mr. Glenn's and Mr. Pinkins' constitutional rights were violated, and each suffered from injuries and damages, including but not limited to the loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries

35

and damages as set forth above.

**Count IV – 42 U.S.C. § 1983**
**Supervisory Liability Against the Hammond Defendant Officers**

170.    Each paragraph of this Complaint is incorporated as if restated fully herein.

171.    The continued wrongful detention of Mr. Glenn and Mr, Pinkins was caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Solan and others, when they failed to adequately train and supervise the individual Hammond Defendant Officers.

172.    Specifically, these supervisory defendants were personally involved in the case against Mr. Glenn and Mr. Pinkins and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

173.    Furthermore, these supervisory Defendants failed to supervise the Defendant Officers in constitutionally adequate law enforcement practices, particularly those concerning the interviews of witnesses, the preparation of forensic reports and the production of exculpatory evidence, thereby encouraging and/or permitting these employees and other Defendants to engage in a reckless investigation, to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Mr. Glenn and Mr. Pinkins.

174.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted

methods used by law enforcement agencies. The fact that the Defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Mr. Glenn's and Mr. Pinkins' constitutional rights.

175.   The personal involvement of the Defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Mr. Glenn and Mr. Pinkins, including the above-mentioned injuries and damages.

176.   The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. Glenn's and Mr. Pinkins' clearly established constitutional rights.

## Count V - 42 U.S.C. § 1983
### Failure to Intervene

177.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

178.   In the manner described above, during the constitutional violations described above, one or more of the Hammond Police Defendants and ISP Defendants stood by without intervening to prevent the misconduct, despite having a reasonable opportunity to do so.

179.   Because of the Defendants' failure to intervene to prevent the violation of Mr. Glenn and Mr. Pinkins' constitutional rights, Mr. Glenn and Mr. Pinkins suffered pain and injury, as well as emotional distress.

180.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Glenn and Mr. Pinkins' rights.

181.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the Hammond Defendants in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the City of Hammond with final policymaking authority.

## Count VI - 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

182.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

183.    After M.W. was raped, the Hammond Defendant Officers and the ISP Defendants reached an agreement amongst themselves to frame Mr. Glenn and Mr. Pinkins for the crime and to thereby deprive them of their constitutional rights and liberty to be continuously taken away from him, all as described in the various Paragraphs of this Complaint.

184.    In this manner, the Defendants, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

185.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts as described in this Complaint and was an otherwise willful participant in joint activity.

186.    As a direct and proximate result of the illicit prior agreement

38

referenced above, Mr. Glenn and Mr. Pinkins' rights were violated, and they suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

187.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

188.   The misconduct described in this Count was undertaken pursuant to the policy and practice of the Hammond Police Department in the manner described more fully in the preceding paragraphs, and was tacitly ratified by policymakers for the City of Hammond with final policymaking authority.

## Count VII - 42 U.S.C. § 1983
### *Monell* Claim Against Defendant City of Hammond

189.   Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

190.   The actions of the Hammond Defendant Officers in fabricating evidence, conducting unduly suggestive identifications, and withholding material exculpatory information from Mr. Glenn and Mr. Pinkins and his counsel were undertaken pursuant to the policies and practices of the Hammond City Police, described above, which were created, maintained, or ratified by policymakers for the City of Hammond with final policymaking authority.

191.   Indeed, the Hammond Defendants had a custom and practice of fabricating and withholding exculpatory evidence. That custom and practice also shows that the Hammond Defendants further failed to supervise, train, and discipline Hammond police officers regarding their obligations not to fabricate or

withhold exculpatory evidence.

192.   In sum, a pattern and practice reveals that the Hammond Defendants had a pattern and practice of misconduct used to secure wrongful prosecutions and convictions prior to the false initiation of charges in this case.

193.   Specifically, before, during, and since the unlawful investigation, prosecution, and conviction of Mr. Glenn and Mr. Pinkins, the City of Hammond and the Hammond Police Department, by and through its final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques by Hammond police investigators, including but not limited to the following:

a.   fabricating evidence;

b.   failing to promptly document and disclose material, exculpatory and impeachment evidence to prosecutors;

c.   destroying evidence;

d.   failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations;

e.   disregarding the Fifth and Fourteenth Amendment rights of criminal suspects and defendants; and

f.   engaging in the ongoing affirmative concealment and cover-up of police misconduct.

194.   The policies and practices described in this Count were maintained and implemented by the City of Hammond with deliberate indifference to Mr. Glenn and Mr. Pinkins' constitutional rights.

195.    As a direct and proximate result of the City of Hammond's actions, Mr. Glenn and Mr. Pinkins' constitutional rights were violated and they suffered injuries and damages, as set forth in this Complaint.

196.    The City of Hammond is therefore liable for the misconduct committed by its officers.

## STATE LAW CLAIMS

### Count VIII
### Negligent Supervision

197.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

198.    The City of Hammond, as well as the supervisory Defendants Solan and others, had a duty to properly train and supervise officers, detectives, and supervise employees of the City of Hammond Police Department and to provide adequate policies to prevent the above conduct, including fabricating evidence, fabricating witness statements, and concealing material impeachment evidence.

199.    The City of Hammond and the supervisory Defendants were grossly negligent and negligent in the training, supervision and discipline of the Defendant Officers, resulting in Mr. Glenn and Mr. Pinkins being deprived of his right to due process, and his right to be free from false arrest, false imprisonment, and wrongful conviction.

200.    Because of this misconduct, Mr. Glenn and Mr. Pinkins suffered injuries, including bodily harm and emotional pain and suffering as more fully alleged above.

## Count IX
## Respondeat Superior

201.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

202.    In committing the acts alleged in the preceding paragraphs, the Defendants were members and agents of the Hammond Police Department, acting at all relevant times within the scope of their employment.

203.    Defendants City of Hammond are liable as principals for all state law torts committed by their agents.

## Count X
## Malicious Prosecution

204.    Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

205.    Defendants, all state actors, acting deliberately, recklessly and under color of law, acted individually and in concert to arrest and imprison Mr. Glenn and Mr. Pinkins for the rape of M.W., without probable cause or other legal justification.

206.    Defendants engaged in these acts despite knowing that probable cause did not exist to arrest or prosecute Mr. Glenn or Mr. Pinkins. Defendants knew that there was no physical evidence connecting Mr. Glenn and Mr. Pinkins to the crime. Yet, Defendants disregarded all the evidence pointing to Mr. Glenn and Mr. Pinkins' innocence.

207.    The only evidence incriminating Mr. Glenn and Mr. Pinkins, as Defendants knew, had been manufactured by the Defendants themselves.

208.    No reasonable police officer would believe such a fabricated evidence

could provide probable cause or even arguable probable cause to arrest, indict or prosecute a suspect.

209.    As is described more fully above, Plaintiffs' convictions were reversed and the charges were dismissed in a manner indicative of their innocence.

210.    Defendants' actions directly and proximately caused Mr. Glenn's and Mr. Pinkins' arrests, indictment, malicious prosecution, unfair trials, wrongful convictions, and deprivation of liberty, as well as all the ongoing injuries and damages set forth above.

**Count XI**
**Intentional or Reckless Infliction of Emotional Distress**

211.    Mr. Glenn and Mr. Pinkins hereby incorporate by reference the foregoing paragraphs and further allege as follows.

212.    Defendants intentionally and/or recklessly, directly and proximately caused Mr. Glenn and Mr. Pinkins, innocent men, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Glenn and Mr. Pinkin to refrain from a) destroying evidence, b) fabricating evidence, c) withholding material, exculpatory and impeachment evidence, d) failing to conduct a constitutionally adequate investigation, and e) maliciously prosecuting Mr. Glenn and Mr. Pinkins and causing their false arrests and imprisonment.

213.    The Defendants' actions caused Mr. Glenn and Mr. Pinkins to suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of their wrongful incarceration, and

to fear for their physical safety throughout the period of their pretrial and post-conviction incarceration.

214.   The Defendants' actions caused Mr. Glenn and Mr. Pinkins to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

## Count XII
## Negligent Infliction of Emotional Distress

215.   Mr Glenn and Mr. Pinkins hereby incorporate by reference all the foregoing paragraphs and further alleges as follows.

216.   Defendants, directly, proximately, and with negligence and/or gross negligence, caused Mr. Glenn and Mr. Pinkins, innocent men, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned, in breach of the duties they owed to Mr. Glenn and Mr. Pinkins to refrain from a) compelling each of them to be a witness against himself, b) destroying evidence, c) fabricating evidence, d) withholding material, exculpatory and impeachment evidence, e) failing to conduct a constitutionally adequate investigation, and f) maliciously prosecuting Mr. Glenn and Mr. Pinkins and causing each of their false arrest and imprisonment, directly and proximately caused Mr. Glenn and Mr. Pinkins to be falsely arrested, maliciously prosecuted, and wrongly imprisoned.

217.   The Defendants' actions caused Mr. Glenn and Mr. Pinkins to suffer physical harm, including physical ailments resulting from the circumstances and

duration of their wrongful incarceration, and to fear for their physical safety throughout the period of their pretrial and post-conviction incarceration.

218.   The Defendants' actions caused Mr. Glenn and Mr. Pinkins to experience severe emotional distress, including, but not limited to humiliation, embarrassment, degradation, loss of trust, permanent loss of natural psychological development, ongoing depression and the continued effects of post-traumatic stress disorder.

**WHEREFORE**, Plaintiffs ROOSEVELT GLENN, SR. and DARRYL PINKINS, SR. respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF HAMMOND, MICHAEL SOLAN, MARK THARP, RAYMOND ROGALSKI, WILLIAM STEPHENS, KENNETH STUMP, PATRICIA KASPER, LEO FINNERTY, the Estate of KIMBERLY EPPERSON, and DIANA PETERSON, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## **JURY DEMAND**

Plaintiffs ROOSEVELT GLENN, SR. and DARRYL PINKINS, SR. hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Elliot Slosar
One of Plaintiffs' Attorneys

Arthur Loevy
Jon Loevy
Tara Thompson
Elliot Slosar
Vincenzo Field
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
Fax: (312) 243-5902